**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **THERMON V. RATLIFF,  JR.,** | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:06-CV-160-Y** |
| | § | |
| **JO ANNE B. BARNHART,** | § | |
| **COMMISSIONER OF SOCIAL SECURITY,** | § | |
| **DEFENDANT.** | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**
**AND**
**NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.      STATEMENT OF THE CASE

Plaintiff Thermon V. Ratliff Jr. brings this action pursuant to Sections 405(g) and 1383(c)(3)

of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of

Social Security denying his claim for disability benefits under Title II and supplemental security

income or SSI benefits under Title XVI of the Social Security Act.  Ratliff applied for disability

insurance and SSI benefits on August 19, 2002 (with a protective filing date of July 18, 2002),

alleging disability commencing February 2, 2001.  (Tr. 22, 121, 325).  After the Social Security

Administration denied Ratliff's applications for benefits both initially and on reconsideration, Ratliff

requested a hearing before an administrative law judge (the "ALJ").   ALJ R. Neil Lewis held a hearing, and on January 30, 2004, issued an unfavorable decision in which he found Ratliff capable of performing his past relevant work.  (Tr. 42-47, 378).   The Appeals Council subsequently vacated that decision and remanded the matter for further proceedings.  (Tr. 49).

ALJ Ward D. King held a second hearing on April 14, 2005 in Fort Worth, Texas.  (Tr. 340).  Ratliff was represented by counsel.  On July 21, 2005, the ALJ issued a decision that Ratliff was not disabled and was not entitled to disability or SSI benefits because he retained the residual functional capacity for a modified range of light work activity.  (Tr. 22-32).   The Appeals Council denied Ratliff's request for review of his case, leaving the ALJ's decision to stand as the final decision of the Commissioner.  (Tr. 3).

B.      STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed.  20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972.   Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is not severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20

C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if the claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible

mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.*  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000);  *Hollis*, 837 F.2d at 1383.

C.      ISSUES

1.      Whether the ALJ properly evaluated Ratliff's residual functional capacity, and whether that assessment is supported by substantial evidence;

2.      Whether the ALJ gave due consideration to medical source opinions; and

3.      Whether the ALJ properly assessed Ratliff's credibility.

D.      ADMINISTRATIVE RECORD

1.      Treatment History

Ratliff was hospitalized on February 3, 2001 with complaints of urinary urgency and frequency, fatigue, and blurred vision.  (Tr. 177).  Laboratory tests confirmed a diagnosis of Type II diabetes.  His blood pressure was also elevated, and he was noted to be very obese.  Ratliff was discharged on February 6, 2001 with insulin, syringes, and an Accu-check machine with which to monitor his blood sugar levels.  (Tr. 178).

Edwin Del Rosario, M.D., Ratliff's primary care physician, examined him on May 7, 2002. Ratliff complained of leg edema, especially with ambulation, and low back pain.  (Tr. 209).  His blood sugars were averaging in the 150 to 180 range.  Ratliff's height was 6'2" and his weight was

370 pounds, placing him the category of morbidly obese.  Pitting edema was noted on examination. (Tr. 209-10).  Ratliff went to the health clinic on June 21, 2002 with complaints of pain, swelling, and gout in his right foot.  (Tr. 180).  Ratliff had a recurrence of gout in September 2002 after running out of his medication.  (Tr. 205-06).

Ratliff underwent a consultative evaluation with internist Lee Etier, M.D., on October 7, 2002. (Tr. 182).  Ratliff complained of fatigue, joint pain in his feet, and occasional blurred vision. He had been diagnosed with gout, but this condition had improved now that he was on medication. (Tr. 182).  His most recent blood sugar readings ranged from 90 to 170.  He complained of "pins and needles" paresthesias of either arm, which woke him up at night, but the problem resolved with movement or rolling over.  He reported low pack pain that limited his ambulation after fifteen or twenty minutes.  Ratliff reported that he had always been significantly overweight. (Tr. 182). Ratliff's height was given as 6'3" and he weighed 457½ pounds.  His blood pressure reading was 170/110.  (Tr. 183).

On examination, leg lifts were limited to about sixty degrees because of Ratliff's back pain. (Tr. 184).  He was able to bend over, touch his shins, and return to an upright position with some difficulty and some back pain reported.  Ratliff had mild edema in his lower extremities and crepitation in his knees, but range of motion was well preserved.  The neurological assessment was unremarkable, as was Ratliff's gait and station.  Ratliff was able to rise on his heels and on his toes, and was able to tandem walk without difficulty. (Tr. 184).  Chest x-rays were normal, and a lumbar spine x-ray showed mild narrowing at L5-S1.  (Tr. 186).  Etier diagnosed morbid obesity, poorly controlled hypertension, Type II diabetes with much improved control on medication, and a history

of gout and low back pain, with decreased range of motion in his back that was exacerbated by his weight. (Tr. 184).

Ratliff reported a flare-up of gout in his left toe and heel during a clinic appointment on December 19, 2002. (Tr. 203). His blood sugars were averaging 120-130. Ratliff also had edema and elevated blood pressure. Ratliff weighed 457 pounds at that appointment. He was given a new medication for gout. (Tr. 204).

During a follow-up visit with Del Rosario in February 2003, Ratliff weighed 445.2 pounds, and his blood pressure was 150/110. (Tr. 201). He complained of increasing leg pain and numbness in all extremities during the past month or two. Del Rosario diagnosed diabetes, diabetic neuropathy, obesity, and gout as measured by increased uric acid. (Tr .202). Del Rosario subsequently completed a physician's statement in support of Ratliff's state welfare-assistance application and advised that his patient had been permanently disabled by his physical impairments since October 7, 2002. (Tr. 248).

Consultative psychiatric examiner Tara Reddy evaluated Ratliff on March 5, 2003. (Tr. 214). Ratliff reported feeling depressed for about three years due to depleted finances, his dependence on others, and his deteriorating physical condition. He complained of irritability, impatience, and an inability to focus or sustain attention. He had no set schedule for going to bed or awakening. He lived with a roommate. He occasionally cooked and did his own laundry, but did no housework. (Tr. 214). Ratliff had a history of alcohol and methamphetamine abuse, but said he had quit several years ago. His physical problems included non-insulin dependent diabetes, gout, hypertension, exogenous obesity, and peripheral neuropathy. (Tr. 215).

Ratliff made good eye contact during the interview, and his speech was coherent and relevant.  His mood was dysphoric, with an appropriate affect.  (Tr .215).  His remote memory was good, and recent memory was excellent.  Reddy noted good concentration, but Ratliff's judgment was impaired as illustrated by his answer that he would open a sealed, addressed, and stamped envelope when Reddy asked him what he would do if he found such a letter.  His insight was intact, and his intelligence was assessed as average.  He demonstrated good impulse control, but his pace and persistence were slow.  (Tr. 215).

Reddy diagnosed recurrent moderate depression, and assessed a Global Assessment of Functioning (GAF) score of 58-60.[1]  Reddy stated that Ratliff had a good prognosis with treatment, but opined that Ratliff would be unable to handle benefits in his best interest because of impaired judgment.  (Tr. 216).

During a check-up in March 2004, Ratliff complained of increasing back pain, chronic diarrhea, and boils on his skin.  (Tr. 306).  He was diagnosed with a staph infection.  (Tr. 307).   In May 2004, Ratliff went to a local emergency room for treatment of jaw pain, which was attributed to an abscess.  (Tr. 285).  He complained of shortness of breath and a cough that had persisted for four days.  (Tr. 289).  Findings on a chest x-ray were consistent with heart failure or vascular overload. (Tr. 290).  Ratliff went to the emergency room on August 12, 2004 with a complaint of shortness of breath.  (Tr. 266).   He was wheezing, and mild edema was noted in his lower

---

[1]  A GAF score is a standard measurement of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32  (4th ed. 1994)(DSM-IV).   A GAF score of 51-60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Id*. at 34.

extremities.  The treating physician assessed congestive heart failure with pulmonary edema.  (Tr. 266-67).  Lasix was prescribed for the edema, and he was discharged.  (Tr. 269).

Ratliff was placed on Lasix to control the edema and was feeling better in October, but complained of boils on his back and abdomen. His shortness of breath had improved, but an echocardiogram was ordered to evaluate the cause.  (Tr. 299-300).  At a check-up on November 30, 2004, Ratliff was "feeling great" and the boils on his back and abdomen had resolved.  (Tr. 297). In January 2005, Ratliff had edema in his lower extremities, and he complained of increased shortness of breath with a cough.  (Tr. 291).  His current blood sugars averaged 110-120.  He was diagnosed with acute bronchitis.  (Tr. 292).  There is a notation in the progress notes that Ratliff's ejection fraction was 35%,[2] although a copy of the echocardiogram report was not provided in the medical records.  (Tr. 291, 346).

The state agency medical consultant who reviewed Ratliff's mental condition determined that he suffered from an affective disorder and had a history of substance addiction disorder that was in remission.  (Tr. 231, 236).  The consultant assessed mild restrictions in Ratliff's activities of daily living and social functioning, and found that Ratliff had moderate difficulty maintaining persistence or pace.[3]  The consultant noted that the mental status evaluation Reddy had performed had been essentially normal except for slow pace and persistence.  (Tr. 242).

---

[2] Ejection fraction is the proportion of the volume of blood in the ventricles at the end of diastole that is ejected during systole, and is often expressed as a percentage. It is normally sixty-five percent (plus or minus eight percent), and lower values indicate ventricular dysfunction.  Dorland's Illustrated Medical Dictionary 708 (29th ed. 2000). Diastole is the dilation of the heart, while systole refers to the contraction of the heart.  Id. at 494, 1781.

[3] The psychiatric review technique form that the state agency psychologist completed combines impairments in concentration, persistence or pace into one category, but to clarify his rating, the state agency psychologist struck through the word "concentration" and underlined the words "persistence" and "pace."  (Tr .238).

The state agency psychologist also completed a psychiatric residual functional capacity assessment, (Tr. 243), and opined that Ratliff had no significant limitation in his ability to remember locations and work procedures; understand, remember, and carry-out very short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; recognize normal hazards and take appropriate precautions; and travel in unfamiliar places and use public transportation. (Tr. 243-44). Ratliff was considered to be moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and work week without interruption from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in work setting; and set realistic goals or make plans independently of others. (Tr. 243-44). The state agency psychologist concluded that Ratliff retained the ability to understand and remember detailed information, respond appropriately to changes in work setting, and overall, had the capacity for simple, repetitive tasks. (Tr. 245).

The state agency medical consultants who addressed Ratliff's physical condition found him capable of light work. (Tr .220). They found Ratliff was limited to occasional climbing, balancing,

stooping, kneeling, crouching, or crawling, and opined that he should avoid concentrated exposure to temperature extremes, humidity, noises, vibration, fumes, and hazardous conditions. (Tr. 221-23).

  2.  Administrative Hearing

  Ratliff testified that he was born September 16, 1968. He completed high school and one semester of college. (Tr. 344). He stopped working in February 2001 when he was hospitalized for his diabetes. (Tr. 346). He worked for a few weeks in early 2002, but was terminated after a flare-up of gout caused him to miss four days of work. (Tr. 345). Before he was put on medication, he experienced a gout attack once or twice a month, and each attack would last four or five days. (Tr. 348). After he started his medication, he has had fewer and less severe attacks unless he must be on his feet for extended periods of time. (Tr. 350-52).

  Ratliff testified that his feet swell and his legs go to sleep on him due to poor circulation. He elevated his legs elevated for extended periods of time to alleviate the swelling and also uses Lasix, but the medication causes an increase in urinary frequency. (Tr. 349, 354). He is tired most of the time and complained of blurred vision from his diabetes and high blood pressure. (Tr. 354, 356). He also complained of back pain on a daily basis, although the cause was unknown. Ratliff was diagnosed with congestive heart failure after complaining of shortness of breath. (Tr. 355). He was told that his heart was 35% enlarged and that he needed to be careful to take Lasix and his blood pressure medication as prescribed. (Tr. 355-56).

  Ratliff testified that his depression posed problems for him as well. On four or five occasions he had spent days lying in bed. (Tr. 359). He felt worthless and unmotivated, and was depressed that his mother had to bathe him. (Tr. 359-60). He testified that he had no money for psychiatric

care or medications.  (Tr. 364-65).

Vocational expert Todd Harden testified during the hearing.  The ALJ asked Harden to consider two hypothetical claimants:

> In the first hypothetical the individual can perform a full range of light work but with these limitations: Only occasional positional changes.  Obviously, you know I mean stooping, crouching and the like.  The individual requires a generally clean environment and so must avoid concentrated exposure to dust, fumes, gases, high humidity, temperature extremes, vibration and hazards.  The individual's limited to jobs at the [reasoning] development level of 1 through 3 as defined in the Dictionary of Occupational Titles.  And, finally, ready access to a bathroom.  My intention in both the environmental limitations, as far as the concentrated exposure I described and ready access to a bathroom is that a normal office, indoor environment would not be precluded.

(Tr. 368).  Harden testified that none of Ratliff's past relevant work would be suitable, but there was other work meeting those requirements, including work as a mail clerk (with 5,500 jobs in Texas and 78,000 jobs nationally), storage facility rental clerk (with 1,300 jobs in Texas and 20,000 jobs nationally), and office helper (with 2,500 jobs in Texas and approximately 30,000 jobs nationally).

The ALJ then asked Harden to consider a hypothetical claimant with all of the limitations from the hypothetical, except the worker was limited to sedentary work instead of light work.  (Tr. 369).   Harden testified that suitable sedentary jobs included eyeglass frame polisher (with 1,200 jobs in Texas and approximately 15,000 jobs nationwide); document preparer (with 1,200 jobs in Texas and 19,000 jobs nationwide); and final assembler (with approximately 1,600 jobs in Texas and 20,000 jobs nationally).  (Tr. 369).  Harden testified that all six of the jobs he had identified were considered entry-level positions, and that he knew of no conflicts between his testimony and the Dictionary of Occupational Titles.

In response to questions from Ratliff's attorney, Harden testified that a person who

11

functioned at 75% of the pace of an average worker could potentially have problems with the mail clerk job, the office helper, and the sedentary jobs he had identified. (Tr. 371). Harden testified that the need to take a five-minute restroom break each hour would not significantly impact the light jobs he had identified. (Tr. 371-72). An inability to stand for more than two hours per day precluded work as an office helper or mail clerk, and could reduce the available number of jobs for a storage facility rental clerk. (Tr. 372). Harden opined that an individual who needed to elevate his legs at least three times a day for twenty minutes at a time in addition to normal breaks during the workday would be unable to maintain employment at any job. (Tr. 375). In addition, when asked about some of the individual areas of moderate impairment in functioning that the state agency medical consultant had checked on the psychiatric residual functional capacity assessment, Harden indicated that work would be precluded unless accommodations were made by the employer. (Tr. 376).

3.     ALJ Decision

The ALJ found that Ratliff had not engaged in substantial gainful activity since February 2001 and suffered from a severe combination of impairments; however, the ALJ found that Ratliff had no impairment or combination of impairments meeting or medically equaling any listed impairment. (Tr. 25). Proceeding to the next step in the sequential evaluation process, the ALJ found that Ratliff retained the residual functional capacity for light work activity,[4] except he was limited to only occasional position changes; a generally clean environment that avoided concentrated exposure to dust, fumes, gases, high humidity, and temperature extremes; work that avoided

---

[4] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. §§ 404.1567(b), 416.967(b).

vibration and hazards; jobs with a reasoning development level of 1, 2, or 3 (as defined in the Dictionary of Occupational Titles); and work providing him with ready access to a bathroom. (Tr. 26). The ALJ found that Ratliff's residual functional capacity precluded him from performing any of his past relevant work, but based on the vocational expert's testimony, the ALJ found that a significant number of jobs existed in the regional and national economies that Ratliff could perform on a sustained basis. (Tr. 30-31). Accordingly, the ALJ found Ratliff was not disabled and was not eligible for disability insurance benefits or SSI payments. (Tr. 32).

D.    DISCUSSION

Ratliff contends that the ALJ's determination at Step Five is not supported by substantial evidence because the ALJ's assessment of his residual functional capacity (RFC) is flawed, and thus, any later determination in the sequential evaluation process is likewise flawed. RFC is what an individual can still do despite his limitations. 20 C.F.R. § 416.945(a); SOCIAL SECURITY RULING 96-8p. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. SOCIAL SECURITY RULING 96-8p; *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. SOCIAL SECURITY RULING 96-8p. RFC is not the least an individual can do, but the most. *Id.* The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence. *Id.* The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. *Id.*

Ratliff contends that the ALJ did not engage in the required function-by-function assessment

before finding him capable of light work activity, but instead, merely recited Ratliff's medical history without any analysis of the medical records or how the medical records supported the assessment of Ratliff's functional capacity.  Ratliff also asserts that the ALJ did not resolve the conflicts in the evidence relating to the poor control of Ratliff's various impairments despite his use of medication as prescribed by his treating physicians.

A review of the ALJ's decision establishes that he sufficiently outlined the reasons underlying his RFC assessment.  The ALJ noted that Ratliff's internal medicine evaluation had produced relatively minimal findings, his gout and diabetes were both improved on medication, and he was no longer insulin-dependent. (Tr. 26).  Ratliff reported fatigue and occasional blurred vision, and he also complained of back pain with range-of-motion exercises; however, his gait and station were not found to be significantly restricted.  (Tr. 26-27).  The ALJ also noted that Ratliff had been obese since high school.  In addition, the ALJ considered the opinions of the state agency medical consultants who found Ratliff was capable of performing a partial range of light work activity with some restrictions in his posture and work environment.  (Tr. 27).

Ratliff  urges that the ALJ failed to give due consideration to Del Rosario's disability opinion. Del Rosario reported that Ratliff was unable to work due to physical impairments and that his disability was permanent.  (Tr. 428). Medical source statements are opinions  from physicians, psychologists or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairments, including symptoms, diagnosis, and prognosis; what the claimant can still do despite those impairments; and the claimant's physical or mental restrictions. 20 C.F.R. §§ 404.1527(a), 416.927(a); SOCIAL SECURITY RULING 96-5p.  Medical source statements

14

should be weighed under the rules set out in the regulations, and the ALJ must provide appropriate explanations for accepting or rejecting the opinions. SOCIAL SECURITY RULING 96-5p. *See generally* 20 C.F.R. §§ 404.1527 416.927. Relevant factors to be considered include: the length of the treatment relationship, frequency of examination, nature and extent of the treating relationship, evidence supporting the opinions, the consistency of those opinions, and medical specialization. 20 C.F.R. §§ 404.1527(d), 416.927(d).

The ALJ considered Del Rosario's disability opinion, but found no basis or supporting documentation for that opinion. (Tr. 29). The ALJ noted that Ratliff had reported fatigue when he saw consultative examiner Etier in October 2002, which is the same month in which Del Rosario asserted that Ratliff's disability began, but he reported no other symptoms related to his diabetes; his gout had improved on medication; his gait and station were unremarkable; and a lumbar spine x-ray showed only mild degenerative changes. (Tr. 29). The ALJ gave no probative value to Del Rosario's opinion that Ratliff's physical impairments were disabling, and his explanation for doing so is both adequate and supported by the evidence.[5]

Moreover, some issues are not medical issues, but instead are administrative findings that dispose of the case and are reserved to the Commissioner. SOCIAL SECURITY RULING 96-5p. Disability has a precise meaning for purposes of Social Security benefits, whereas most physicians are not experts on the Social Security Act. *Milam v. Bowen,* 782 F.2d 1284, 1287 -1288 (5th Cir.

---

[5] Ratliff asserts that the Appeals Council earlier found that Etier's report substantially supports Del Rosario's disability opinion; however, the Appeals Council only noted that Etier's report "agreed somewhat" with Del Rosario in that Etier had opined that Ratliff suffered from uncontrolled hypertension. (Tr. 49). The ALJ, however, acknowledged that Ratliff's hypertension was a severe impairment. The ALJ also limited Ratliff to light work with a clean environment that avoided extreme temperature changes and high humidity. Ratliff has not demonstrated that the ALJ failed to sufficiently account for Ratliff's hypertension in his decision.

1986).  *See generally* 42 U.S.C. § 423(d). Statements by a medical source that a person is disabled or unable to work are opinions on issues reserved to the Commissioner and will not be given any special significance.  20 C.F.R. § 404.1527(e)(3). In addition, such statements are not medical opinions that must be weighed in accordance with the framework set out in the regulations.  *See id*. § 404.1527(a)(2), (e).  The ALJ's decision to assign no probative value to Del Rosario's conclusory statement that Ratliff was unable to work is consistent with the relevant administrative regulations and rulings.

With respect to his mental impairments, Ratliff asserts that the reports from the state agency psychologist and consultative examiner Reddy support a finding of disability in light of the testimony the vocational expert offered during the administrative hearing.  Ratliff's counsel questioned the vocational expert about a hypothetical claimant with a 25-33% limitation in his ability to complete a normal workday and work week without interruption from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; perform activities within a schedule, maintain regular attendance; be punctual within customary tolerances; and maintain attention and concentration for extended periods.  The vocational expert opined that these additional limitations would preclude performance of the jobs he had previously identified.

Findings of fact made by state agency medical and psychological consultants regarding the nature and severity of an individual's impairments are treated as expert opinion evidence (from nonexamining sources) at the administrative hearing and Appeals Council levels of administrative review. 20 C.F.R. §§404.1527(f), 416.927(f); SOCIAL SECURITY RULING 96-6p.  The administrative

law judge and the Appeals Council are not bound by the state agency physicians' opinions, but may not ignore them and must explain the weight given to these opinions in their decisions.  SOCIAL SECURITY RULING 96-6p.

Ratliff acknowledges that the ALJ gave significant weight to the opinions of the state agency psychologist in assessing the severity of his mental impairment at Step Three of the sequential evaluation process, but complains that the ALJ then gave no consideration to the functional limitations found by the state agency psychologist and reported by Reddy during the consultative evaluation.  The ALJ found Ratliff capable of performing basic work activities, such as understanding, remembering, and executing simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting.  (Tr. 28-29).  The ALJ considered this assessment to be generous given the medical record, and stated that he was adopting some of the nonexertional limitations found by the state agency medical consultants even though such limitations were not well-supported by the medical evidence.  (Tr. 29).  Ratliff's assertion that the ALJ did not consider the functional capacity assessment provided by the state agency is not supported by the record.

Ratliff also fails to demonstrate a lack of substantial evidence to support the ALJ's assessment of the restrictions imposed by his mental impairment.  Although Reddy opined that Ratliff's judgment was impaired, the state agency medical consultant who reviewed Reddy's report in its entirety noted that the mental status evaluation had been essentially normal, although he demonstrated slow pace and persistence.  (Tr. 240).  And contrary to Ratliff's claims, the state agency medical consultant did not find him disabled despite assessing moderate limitation in some

areas of his occupational functioning. (Tr. 243-46). Instead, the consultant found Ratliff retained the ability to understand and remember detailed information, accept input from others, and respond to changes in work setting, and overall, retained the capacity for simple, repetitive tasks. (Tr. 245).

Ratliff contends that there is a conflict between the state agency medical psychologist's determination that he could perform simple, repetitive tasks and the ALJ's determination that Ratliff was limited to work requiring a reasoning development level of 1, 2, or 3 as defined in the Dictionary of Occupational Titles (DOT).[6] Ratliff relies on *Hackett v. Barnhart*, 395 F.3d 1168 (10th Cir. 2005). In *Hackett*, the court of appeals compared vocational expert testimony that a claimant who was limited to simple, routine tasks could perform the work of call-out operator or surveillance-system monitor with the DOT, which indicated that both jobs required a reasoning level of three. *Id.* at 1176. The court found that level-three reasoning requirements appeared to be inconsistent with Hackett's RFC and remanded the case to the administrative level to address the conflict between the vocational expert's testimony and the DOT. *Id.* Unlike the circumstances in *Hackett*, the ALJ specifically found Ratliff capable of work requiring level 1, 2, or 3 reasoning skills, which creates no vocational conflict that must be resolved.

Furthermore, the state agency psychologist found both that Ratliff retained the ability to understand and remember detailed information and that he possessed the overall capacity for simple

---

[6] "Level 3" reasoning skills require commonsense understanding to carry out instructions furnished in a written, oral, or diagrammatic form and deal with problems involving several concrete variable in or from standardized situations. *See* DICTIONARY OF OCCUPATIONAL TITLES app. C (rev. 4th ed. 1991) (Scale of General Education Development). "Level 2" reasoning skills require the employee to apply commonsense understanding to execute detailed but uninvolved instructions and deal with problems involving a few concrete variables in or from standardized situations. *See id.*. "Level 1" reasoning skills require the application of commonsense understanding to carry out simple one- or two-step instructions and dealing with standardized situation with occasional or no variable in situations encountered on the job. *See id.*

and repetitive tasks.  To the extent these findings pose a conflict with the ALJ's  assessment, the

ALJ must consider the reports prepared by state agency medical consultants, but he is not bound to

adopt those findings. *Reyes v. Sullivan*,  915 F.2d 151, 154 (5th Cir. 1990).   The ALJ even noted that

he was taking a generous approach to Ratliff's mental impairments in light of the medical record.

 (Tr. 29).  The  ALJ did not deny that Ratliff suffered from an affective disorder, but determined that

the impairment could be accommodated by limiting him to work requiring the lowest categories of

reasoning skills.  (Tr. 27-29). And with respect to the various functional limitations that counsel

presented to the vocational expert during the hearing, the ALJ apparently did not find it appropriate

to include more limitations than those already incorporated into the functional capacity assessment.

The ALJ sufficiently articulated the reasons underlying his assessment of Ratliff's mental RFC and

gave adequate attention to the opinions of the state agency medical consultants who reviewed

Ratliff's impairments at earlier stages of the administrative proceedings.

Ratliff further complains that the ALJ did not properly assess his credibility.  In evaluating

a claimant's subjective complaints, the ALJ first considers whether there is a medically determinable

impairment that could reasonably be expected to produce the pain or other symptoms.  20 C.F.R. §§

404.1529(b), 416.929(b); SOCIAL SECURITY RULING 96-7p. Once the impairment is found, the ALJ

evaluates the intensity, persistence and limiting effects of the symptoms on the claimant's ability

to do basic work activities.  20 C.F.R. §§ 404.1529, 416.929.  A claimant's testimony must be

consistent with the objective medical evidence and other available evidence.  *Id*.; 20 C.F.R. §

416.929.  In all cases in which pain or other symptoms are alleged, the administrative decision must

contain a thorough discussion and analysis of the objective medical and other evidence, including

the individual's complaints of pain or other symptoms and the adjudicator's own observations. SOCIAL SECURITY RULING 95-5p.  A claimant's statements as to  pain and other symptoms are not conclusive evidence of disability, but must be accompanied by medical signs and findings of a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged and that would lead to the conclusion that an individual is disabled. 42 U.S.C. §423(d)(5)(A).

The ALJ agreed that Ratliff's exertional and nonexertional capabilities were compromised, but not to the degree that Ratliff alleged.  (Tr. 30). The ALJ found Ratliff's subjective complaints of disabling symptoms and limitations were inconsistent with the objective medical record and also reflected a misunderstanding of the medical findings.[7]  The ALJ noted that medication was controlling Ratliff's diabetes; obesity was a long-term problem for Ratliff that had not prevented him from working in the past; Ratliff was able to ambulate without an assistive device; and Ratliff reported only four or five depressive episodes in the past that had lasted for a few days each.  (Tr. 29).  The ALJ also noted that Ratliff reported being depressed for years, but had not sought treatment for that condition.[8]  In addition, there were conflicting reports about Ratliff's recent use of illegal drugs that caused the ALJ to doubt Ratliff's credibility.  The ALJ's explanation

---

[7] For example, Ratliff reported a hemoglobin level over 800 and asserted that his heart was 35% enlarged. Actually, Ratliff's blood-sugar level, not his hemoglobin,  had exceeded 800 the day before his alleged disability onset date, and it was Ratliff's ejection fraction that had measured 35%.  (Tr. 29). Ratliff's counsel contends that Ratliff could not be expected to understand the difference, but that contention does not conflict with or undermine the ALJ's observation that Ratliff misunderstood the record.

[8] Counsel speculates that Ratliff's failure to seek mental health treatment was possibly the result of poor judgment, but does not support that statement.  Ratliff indicated during the hearing that one reason he did not seek mental health treatment was due to his finances.  Counsel's statement also seems at odds with Ratliff's documented ability to seek medical assistance and follow a treatment regimen for his various physical ailments.

demonstrates that he considered Ratliff's credibility in accordance with the criteria outlined in the administrative regulations and rulings. *See generally* 20 C.F.R. §§ 404.1529(b), 416.929(b); SOCIAL SECURITY RULING 96-7p.

The ALJ's decision sets out the functional requirements of light work and the evidence the ALJ considered in deciding that Ratliff could perform this level of activity if postural changes were limited, he was given access to bathroom facilities, and he was confined to a clean work environment and simpler tasks. (Tr. 26). When presented with these limitations, the vocational expert was able to identify several entry-level jobs that would be suitable. Although Ratliff would prefer a more detailed analysis of his physical restrictions, the Fifth Circuit has declined to prescribe any rigid or set formula for the ALJ to follow when articulating the reasons underlying his decision on disability. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994). The ALJ adequately addressed the matter of Ratliff's RFC and sufficiently discussed the evidence and how it supported his assessment. Ratliff has not demonstrated a lack of substantial evidence to support the decision that he is not disabled, nor has he established that the Commissioner's determination is the product of legal error.

<u>RECOMMENDATION</u>

It is recommended that the Commissioner's decision be affirmed.

<u>NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT</u>

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's

proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document.  The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until December 6, 2006.  The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1).  Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

<u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until December 6, 2006 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.  It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED NOVEMBER   16  , 2006.

 /s/ Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE